

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:

SCOTT ERNEST CRITES and
CAROL YATES CRITES,

Case No. 6:07-bk-05739-ABB
Chapter 7

Debtors.
_____/

WALL STREET MANAGEMENT &
CAPITAL, INC., *et al.*,

Plaintiffs,

Adv. Pro. No. 6:08-ap-00106-ABB

v.

SCOTT ERNEST CRITES and
CAROL YATES CRITES,

Defendants.
_____/

## MEMORANDUM OPINION

This matter came before the Court on the Amended Complaint to Determine Dischargeability of Indebtedness (Doc. No. 21) ("Complaint") filed by the Plaintiffs Wall Street Management & Capital, Inc. ("Wall Street"), James R. Schnorf ("Schnorf"), Midwest Venture Capital, David Titus, and Cathy Titus Waggoner against Scott Ernest Crites and Carol Yates Crites, the Debtors and Defendants herein (collectively, "Debtors"), seeking to have various debts arising from a series of loans transactions deemed nondischargeable pursuant to 11 U.S.C. Sections 523(a)(2)(A) and 523(a)(2)(B).

This matter involves only Wall Street and Scott Crites ("Crites"). Mrs. Crites was dismissed as a party defendant pursuant to the Order entered on October 31, 2008 (Doc. No. 41). Midwest Venture Capital, David Titus, Cathy Titus Waggoner, and Schnorf, in

his individual capacity, dismissed their claims against the Debtors. Wall Street dismissed all counts of the Complaint against Crites except its Seventh Claim for Relief.

The final evidentiary hearing was held on November 3, 2009 at which Crites, his counsel, Schnorf, as the President of Wall Street, and counsel for Wall Street appeared. The parties, pursuant to the Court's directive filed post-hearing briefs (Doc. No. 68 and proposed orders). Judgment is due to be entered in favor of the Debtors and against the Plaintiffs for the reasons set forth herein. The Court makes the following Findings of Fact and Conclusions of Law after reviewing the pleadings and evidence, hearing live testimony and argument, and being otherwise fully advised in the premises.

## **FINDINGS OF FACT**

### *Background*

Crites formed Breakfast Club America, LLC ("BCA") in 2004, a North Carolina limited liability company, which sold business networking franchises nationally. Crites is the President and Managing Member of BCA. Wall Street is a Florida corporation that provides financial management and advisory services to businesses. Schnorf is Wall Street's President and sole shareholder. He is a Certified Public Accountant, holds a Master of Business Administration degree, and has more than thirty years of accounting and financial advisory experience.

Crites desired to expand BCA's business in 2005 and needed financing for the expansion. Crites and Schnorf were introduced by a mutual acquaintance. Crites engaged Wall Street to provide financial management and capital raising services to BCA. BCA and Schnorf executed a Financial Consulting Agreement on April 23, 2005

(Crites' Ex. 2) ("Consulting Agreement").[1] The Consulting Agreement provides Wall Street, among other things, was to identify potential funding sources for BCA and facilitate introductions to potential funding sources and potential franchise purchasers. Wall Street's compensation included a monthly fee of $15,000.00, a percentage of any funding obtained by Wall Street, a percentage of revenues, and an option to purchase ownership interests in BCA.

The scope of Wall Street's engagement was expanded by the First Amendment to Financial Consulting Agreement executed by Wall Street and BCA on May 13, 2005:

> The parties acknowledge that BCA has requested that [Wall Street] substantively and immediately broaden the scope of its intended efforts contemplated in the Agreement to include detailed assistance regarding the format, content, and philosophy concerning the financial statements of BCA, and concentrated assistance concerning the preparation of financial statements and presentation of materials to prospective funding sources and franchisees.

(Crites' Ex. 2).

BCA and Schnorf, individually, executed an Employment Agreement whereby Schnorf was engaged as an employee of BCA (Crites' Ex. 3). His duties included the oversight "of all financial, legal, and business matters of [BCA]" and "direct review and approval of internal periodic financial statements prepared by [BCA], all banking relationships, tax matters . . . most legal matters . . . cash management . . . ." (Id.). Schnorf prepared the Employment Agreement, the Consulting Agreement, and its amendments.

Schnorf maintained an office within BCA's offices in Longwood, Florida and provided services, individually and through Wall Street, to BCA from 2005 through

---

[1] Crites' company 1st and Ten Marketing, Inc. executed the Agreement and engaged Wall Street's services. 1st and Ten was later merged into BCA.

2006. He and Crites developed a close relationship and he visited the Debtors' home on occasion. Schnorf had access to all of BCA's financial information including tax returns and financial statements. He was intimately familiar with BCA's financial standing and Crites' personal financial standing.

Crites approached Schnorf in the spring of 2005 and requested a short-term loan for BCA. Schnorf agreed and Wall Street loaned $40,000.00 to BCA, which BCA promptly repaid in May 2005. Wall Street made a loan of $110,000.00 to BCA in June 2005, which BCA repaid in September 2005. Neither Schnorf nor Wall Street requested or required a personal financial statement from Crites.

Wall Street made a series of short-term loans to BCA from September through December 2005. The loans are documented by promissory notes, loan agreements, the Second Amendment to Financial Consulting Agreement, a Share Pledge Agreement, a Security Agreement, and a UCC Financing Statement (Crites' Exs. 2-9). Crites personally guaranteed the loans pursuant to various guaranty agreements. Schnorf drafted the loan and guaranty documents and charged BCA substantial fees for such services. The parties stipulated the loan balance owed by Mr. Crites to Wall Street pursuant to his personal guarantees is $135,000.00.

Wall Street contends it made the September 2005 and subsequent loans to BCA based upon a Personal Financial Statement prepared by Crites and presented to Schnorf in early September 2005 (Crites' Exs. 15, 20). Schnorf testified he would not make any loans to BCA, after the June 2005 loan was repaid, without a personal financial statement from Crites. Schnorf stated Crites, pursuant to Schnorf's demand for a personal financial statement, brought to him in early September 2005 a partially completed Personal

Financial Statement signed by Crites and dated September 2, 2005. They sat down together and reviewed the information. Schnorf completed the form by writing in asset descriptions, valuations, liabilities and income and expense figures (Crites' Exs. 15, 20). Schnorf asserts the statement was prepared by Crites solely for Wall Street and for the purpose of obtaining the September 2005 and subsequent loans. Schnorf asserts it was not prepared for any other lender and Wall Street relied upon it in making the September 2005 and subsequent loans.

Schnorf's version of events is not credible. His testimony is contradicted by the documentary evidence and the credible testimony of McCauley "Trey" F. Barnes, III ("Barnes") and Crites.

Barnes, the Senior Vice President and Market President of Commercial Bank of Florida, attended a BCA networking event and met Crites and Schnorf. Crites and Schnorf contacted Barnes during the summer of 2005 and inquired about obtaining a loan for BCA. Crites and Schnorf submitted financial information to Barnes and they engaged in email communications (Crites' Exs. 12, 14). Crites and Barnes, through email communications in August 2005, scheduled a meeting for September 2, 2005. Crites and Schnorf met with Barnes at Barnes' office on September 2, 2005 and discussed obtaining a line of credit for BCA (Crites' Ex. 13).

Barnes requested at the meeting additional financial information including a personal financial statement for Crites and his father Elmer Crites as potential loan guarantors. Barnes identified Crites' Exhibits 15 and 16 as the Personal Financial Statements of Crites and Crites' father which were provided to Barnes subsequent to the September 2, 2005 meeting. Commercial Bank ultimately denied BCA's loan request.

The documentary evidence and Crites' testimony corroborate Barnes' testimony. Crites, after the meeting with Barnes on September 2, 2005, quickly prepared the Personal Financial Statement (Crites' Exs. 15, 20 in response to Barnes' request for personal financial information. He presented the partially completed document to Schnorf for his review and input as BCA's financial manager. Crites and Schnorf reviewed the document together and Schnorf completed it based upon his first-hand knowledge of Crites' financial standing and Crites' input.

The Personal Financial Statement lists assets owned by Crites individually and jointly with his wife including their home, vehicles, business interests, and jewelry. Schnorf calculated most of the asset valuations including the sports memorabilia of $30,000.00, Crites' BCA ownership interest of $1,200,000.00, and "other pers property" of $50,000.00 relating to a medical malpractice claim Crites had against a Florida hospital. The document sets forth total assets of $2,036,000.00 and total liabilities of $419,000.00, resulting in a net worth of $1,617,000.00.

Crites signed the completed Personal Financial Statement on September 2, 2009 and faxed it to Barnes on September 7, 2009 (Crites' Exs. 15, 20. Schnorf knew Crites had delivered the document to Barnes. Crites did not present the document to any other persons or entities. He, with the Schnorf's assistance, prepared and signed the Personal Financial Statement for the sole purpose of obtaining a loan for BCA from Commercial Bank. Crites did not prepare or present a personal financial statement to Schnorf or Wall Street for the purpose of obtaining a loan. Neither Schnorf nor Wall Street relied upon the Personal Financial Statement in making any loans to BCA.

BCA's business declined throughout 2006 and 2007 and it was unable to repay Wall Street's loans. Southern California Breakfast Clubs, Inc., a BCA franchise, instituted a civil action against BCA and the Debtors in May 2007 in the United States District Court for the Southern District of California alleging various breaches of the franchise agreement and other causes of action. BCA ceased operations in June 2007. The Debtors filed a Chapter 7 bankruptcy case on November 14, 2007 ("Petition Date").

### *Dischargeability Analysis*

Wall Street filed a multi-count Complaint alleging an indebtedness of $291,504.00 arising from the September 2005 and subsequent loans is non-dischargeable pursuant to 11 U.S.C. Sections 523(a)(2)(A) and 523(a)(2)(B). The parties stipulated the amount of $135,000.00 is owed.

### *First, Second, Third, Fourth, Fifth, and Sixth Causes of Action*

The Plaintiffs dismissed the First, Second, Third, Fourth, Fifth, and Sixth Causes of Action (Doc. No. 41). Judgment is due to be entered in favor of the Debtors and against the Plaintiffs on the First, Second, Third, Fourth, Fifth, and Sixth Causes of Action.

### *Seventh Cause of Action*

Wall Street asserts in its Seventh Cause of Action Crites falsely represented his net worth to Wall Street in the Personal Financial Statement and the loan debt is nondischargeable pursuant to Sections 523(a)(2)(A) and 523(a)(2)(B). Wall Street did not establish any of the nondischargeability elements of Section 523(a)(2)(A) or 523(a)(2)(B). It did not establish the information contained in the Personal Financial Statement is false. The majority of the information contained in the document was

inserted by Schnorf based upon his personal knowledge of Crites' and BCA's financial condition.

Crites did not present the Personal Financial Statement to Schnorf for the purpose of obtaining a loan from Wall Street or Schnorf. Crites prepared the document after the September 2, 2005 meeting with Barnes and presented the partially completed document to Schnorf as BCA's financial advisor. Crites and Schnorf jointly completed the Personal Financial Statement and submitted it to Commercial Bank for the purpose of obtaining a loan from Commercial Bank.

Crites did not make any false or deceptive representations in obtaining the loans from Wall Street. Wall Street did not rely upon the Personal Financial Statement in making any loans to BCA. The indebtedness owed by Crites to Wall Street is dischargeable and due to be discharged pursuant to Sections 523(a)(2)(A) and 523(a)(2)(B).

Crites requests an award of attorney's fees and costs in his closing brief. He did not previously request fees or seek sanctions against Wall Street. He has not established a basis for an award of fees and costs and his request is due to be denied.

## CONCLUSIONS OF LAW

Wall Street has the burden to establish the debt of $135,000.00 is nondischargeable by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 291 (1991). Exceptions to discharge "should be strictly construed against the creditor and liberally in favor of the debtor." Schweig v. Hunter (In re Hunter), 780 F.2d 1577, 1579 (11th Cir. 1986).

## *11 U.S.C. Section 523(a)(2)(A)*

Section 523(a)(2)(A) provides a discharge pursuant to Section 727 does not discharge an individual from any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—"

> false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A). Wall Street must establish the traditional elements of common law fraud to prevail in a Section 523(a)(2)(A) action: (i) Crites made a false representation to deceive Wall Street; (ii) Wall Street relied on the misrepresentation; (iii) the reliance was justified; and (iv) Wall Street sustained a loss as a result of the misrepresentation. SEC v. Bilzerian (In re Bilzerian), 153 F.3d 1278, 1281 (11th Cir. 1998); Fuller v. Johannessen (In re Johannessen), 76 F.3d 347, 350 (11th Cir. 1996). It must establish each of the four elements by a preponderance of the evidence. Grogan, 498 U.S. at 291; In re Wiggins, 250 B.R. 131, 134 (Bankr. M.D. Fla. 2000).

A determination of fraudulent intent is an issue of fact and "depends largely upon an assessment of the credibility and demeanor of the debtor . . . ." Equitable Bank v. Miller (In re Miller), 39 F.3d 301, 305 (11th Cir. 1994). A review of the totality of the circumstances is relevant in determining a debtor's intent. Id. A creditor cannot establish non-dischargeability pursuant to Section 523(a)(2)(A) without proof of reliance on intentional misstatements by the debtor. City Bank & Trust Co. v. Vann (In re Vann), 67 F.3d 277, 280 (11th Cir. 1995). The reliance upon the debtor's false representation must be justified. Field v. Mans, 516 U.S. 59, 73-75 (1995); In re Vann, 67 F.3d at 283-84. Whether such reliance is justified is determined by a subjective test. Id. at 281. A

plaintiff, as the final nondischargeability element, must establish a causal link between the debtor's intentional misrepresentation and the resulting loss sustained by the plaintiff. Lightner v. Lohn, 274 B.R. 545, 550 (M.D. Fla. 2002).

Wall Street did not establish any of the elements of Section 523(a)(2)(A). It did not establish Crites made any false representations to deceive Wall Street. Crites made no false representations either in writing or in any other manner. Crites, at no time during the BCA loan transactions with Wall Street, acted with bad intent. There were no misrepresentations by Crites upon which Wall Street relied. Wall Street did not establish it sustained a loss, monetary or otherwise, as a result of any misrepresentation by Crites.

## *11 U.S.C. § 523(a)(2)(B)*

Section 523(a)(2)(B) excepts a debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by:

> (B) use of a statement in writing—
> (i) that is materially false;
> (ii) respecting the debtor's or an insider's financial condition;
> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
> (iv) that the debtor caused to be made or published with intent to deceive.

11 U.S.C. § 523(a)(2)(B). An objecting creditor must also establish causation--that it sustained a loss as a result of the representation, which is an implied element of Section 523(a)(2)(B). Collins v. Palm Beach Sav. & Loan (In re Collins), 946 F.2d 815, 816 (11th Cir. 1991). The debt is dischargeable if any one of the elements is not established. In re Miller, 39 F.3d at 304. The "intent to deceive" analysis employs the same intent analysis employed in a Section 523(a)(2)(A) determination.

Wall Street did not establish any of the elements of Section 523(a)(2)(B). It did not establish Crites obtained the loans through a writing respecting his financial condition that was materially false. Crites made no false statements in the Personal Financial Statement. He, with Schnorf's assistance, prepared the document for the purpose of obtaining a loan from Commercial Bank. Wall Street did not rely upon the Personal Financial Statement in extending loans to BCA. Wall Street did not establish it sustained a loss as a result of any misrepresentation by Crites.

Wall Street did not establish the loan indebtedness is nondischargeable pursuant to 11 U.S.C. Section 523(a)(2)(A) or Section 523(a)(2)(B). The indebtedness is dischargeable and due to be discharged. Crites has not established a basis for an award of attorney's fees and costs and his fee request is due to be denied. 11 U.S.C. §§ 523(d), 105(a).

Accordingly, it is

**ORDERED, ADJUDGED and DECREED** that Crites' request for an award of attorney's fees and costs is hereby **DENIED**.

A separate Judgment consistent with these Findings of Fact and Conclusions of Law shall be entered contemporaneously.

Dated this 7th day of December, 2009.

ARTHUR B. BRISKMAN
United States Bankruptcy Judge